THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: May 25, 2012



_____
Honorable Pamela Pepper
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

| | | |
|---|---|---|
| IN RE: | KEVIN C. WILLIAMS, d/b/a KCW, INC., | Case No. 11-24658-pp |
| | | Chapter 13 |
| | Debtor. | |
| IN RE: | JUDSON W. CAMPBELL THERESE M. CAMPBELL, | Case No. 11-28144-pp |
| | | Chapter 13 |
| | Debtors. | |
| IN RE: | RITA GILLESPIE, | Case No. 11-31185-pp |
| | | Chapter 13 |
| | Debtor. | |

_____

KEVIN WILLIAMS,                                Adv. Case No. 11-2527

    Plaintiff,

v.

CITY OF MILWAUKEE CITY CLERK,

    Defendant.

JUDSON W. CAMPBELL and                         Adv. Case No. 11-2561
THERESE M. CAMPBELL,

    Plaintiffs,

1

v.

CITY OF MILWAUKEE,

    Defendant.

RITA GILLESPIE,                Adv. No. 11-2597

    Plaintiff

v.

CITY OF MILWAUKEE,

    Defendant.

---

**ORDER DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT, GRANTING PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT, AND AVOIDING AS FRAUDULENT CONVEYANCES THE PRE-PETITION TRANSFERS OF THE PLAINTIFFS' PROPERTIES VIA TAX LIEN FORECLOSURE**

---

Findings of Fact

  **KEVIN C. WILLIAMS**

1. On April 1, 2011, Kevin C. Williams filed a petition for relief under Chapter 13 of the Bankruptcy Code. (See bankruptcy court docket for case no. 11-24658, docket no. 1.)

2. On the schedules filed on April 19, 2011, Kevin Williams indicated that he owned property at 3202 North Sherman Boulevard, Milwaukee, WI. He valued his interest in that property at $100,000, and indicated that he owed $25,000 on it. (See bankruptcy court docket for case no. 11-24658, docket no. 14, Schedule A.)

3. On July 20, 2011, Kevin Williams filed an adversary complaint against the City of Milwaukee City Clerk. The complaint alleged that the property on Sherman Boulevard had been transferred to the City of Milwaukee within one year prior to the filing of the bankruptcy petition, and that this transfer constituted a fraudulent transfer in violation of §548 of the Bankruptcy Code.

(See bankruptcy court docket for adversary case no. 11-2527, docket no. 1.)

4.      On November 14, 2011, defendant City of Milwaukee filed a motion for summary judgment in the adversary proceeding. (See bankruptcy court docket for adversary case no. 11-2527, docket no. 9.)

5.      Filed with the motion for summary judgment was an affidavit by Kerry R. Urban, Special Assistant to the Milwaukee County Treasurer. The affidavit stated that the City had foreclosed on the Sherman Boulevard property, pursuant to the State of Wisconsin's tax foreclosure procedure, because Williams had owed delinquent taxes totaling $14,518.51 for the tax years 2007 and 2008. (See bankruptcy court docket for adversary case no. 11-2527, docket no. 9, Exhibit 6.)

6.      Also filed with the motion for summary judgment was Kevin Williams' 2007 City of Milwaukee Combined Property Tax Bill, showing a total assessed value for the Sherman Boulevard property of $190,400, and a total estimated fair market value of $206,300. (See bankruptcy court docket for adversary case no. 11-2527, docket no. 9, Exhibit 12.)

7.      Kevin Williams filed a cross-motion for summary judgment on February 21, 2012. (See bankruptcy court docket for adversary case no. 11-2527, docket no. 18.) Williams also filed a supporting brief. (Id. at docket no. 19.) The City filed its reply on March 12, 2012. (Id. at docket no. 20.)

8.      The parties presented oral argument on April 2, 2012. (Id. at docket no. 25 (audio recording).) At that hearing, counsel for the plaintiffs presented the Court and counsel with copies of Murphy v. Town of Harrison (In re Murphy), 331 B.R. 107 (Bankr. S.D.N.Y. 2005). The City asked for an opportunity to respond, and the Court allowed the parties to present supplemental briefs. Id. The City filed its supplemental brief on April 16, 2012. (Id. at docket no. 22.) Kevin Williams filed his letter brief on April 20, 2012. (Id. at docket no. 23.)

**JUDSON W. AND THERESE M. CAMPBELL**

9.      On May 19, 2011, Judson W. and Therese M. Campbell filed a petition for relief under Chapter 13 of the Bankruptcy Code. (See bankruptcy court docket for case no. 11-28144, docket no. 1.)

10.     On the schedules filed on June 23, 2011, the Campbells indicated that they owned property at 4893 North 66th Street, Milwaukee, WI. They valued their interest in that property at $88,500, and indicated that they owed $13,406.76 on it. (See bankruptcy court docket for case no. 11-28144, docket

no. 15, Schedule A.)

11.     On August 3, 2011, the Campbells filed an adversary complaint against City of Milwaukee.  The complaint alleged that the property on North 66th Street had been transferred to the City of Milwaukee in the year prior to the filing of the bankruptcy petition, and that this transfer constituted a fraudulent transfer in violation of §548 of the Bankruptcy Code.  (See bankruptcy court docket for adversary case no. 11-2561, docket no. 1.)

12.     On November 14, 2011, defendant City of Milwaukee filed a motion for summary judgment in the adversary proceeding.  (See bankruptcy court docket for adversary case no. 11-2561, docket no. 9.)

13.     Filed with the motion for summary judgment was an affidavit by Kerry R. Urban, Special Assistant to the Milwaukee County Treasurer.  The affidavit stated that the City had foreclosed on the North 66th Street property, pursuant to the State of Wisconsin's tax foreclosure procedure, because the Campbells had owed delinquent taxes totaling $8,121.35 for the tax years 2006, 2007 and 2008.  (See bankruptcy court docket for adversary case no. 11-2561, docket no. 9, Exhibit 6.)

14.     Also filed with the motion for summary judgment was the Campbells' 2006 City of Milwaukee Combined Property Tax Bill, showing a total assessed value for the North 66th Street property of $109,500, and a total estimated fair market value of $115,900.  (See bankruptcy court docket for adversary case no. 11-2561, docket no. 9, Exhibit 11.)

15.     The Campbells filed a cross-motion for summary judgment on February 21, 2012.  (See bankruptcy court docket for adversary case no. 11-2561, docket no. 19.)  The Campbells also filed a supporting brief.  (Id. at docket no. 20.)  The City filed its reply on March 12, 2012.  (Id. at docket no. 21.)

16.     The parties presented oral argument on April 2, 2012.  (Id. at docket no. 27 (audio recording).)  At that hearing, counsel for the plaintiffs presented the Court and counsel with copies of Murphy v. Town of Harrison (In re Murphy), 331 B.R. 107 (Bankr. S.D.N.Y. 2005).  The City asked for an opportunity to respond, and the Court allowed the parties to present supplemental briefs.  Id. The City filed its supplemental brief on April 16, 2012.  (Id. at docket no. 24.) The Campbells filed their letter brief on April 20, 2012.  (Id. at docket no. 25.)

**RITA GILLESPIE**

17.     On July 18, 2011, Rita Gillespie filed a petition for relief under Chapter

4

Case 11-02561-gmh    Doc 28    Filed 05/25/12    Page 4 of 20

13 of the Bankruptcy Code. (See bankruptcy court docket for case no. 11-31185, docket no. 1.)

18. On the schedules filed on August 12, 2011, Gillespie indicated that she owned property at 2979 North Palmer Street, Milwaukee, WI. She valued her interest in that property at $60,000, and indicated that she owed $16,915.77 on it. (See bankruptcy court docket for case no. 11-31185, docket no. 11, Schedule A.)

19. On August 15, 2011, Gillespie filed an adversary complaint against City of Milwaukee. The complaint alleged that the property on North Palmer Street had been transferred to the City of Milwaukee within ninety days prior to the filing of the bankruptcy petition, and that this transfer constituted a fraudulent transfer in violation of §548 of the Bankruptcy Code. (See bankruptcy court docket for adversary case no. 11-2597, docket no. 1.)

20. On November 14, 2011, defendant City of Milwaukee filed a motion for summary judgment in the adversary proceeding. (See bankruptcy court docket for adversary case no. 11-2597, docket no. 6.)

21. Filed with the motion for summary judgment was an affidavit by Kerry R. Urban, Special Assistant to the Milwaukee County Treasurer. The affidavit stated that the City had foreclosed on the North Palmer Street property, pursuant to the State of Wisconsin's tax foreclosure procedure, because Gillespie had owed delinquent taxes totaling $12,070.77 for the tax years 2007, 2008 and 2009. (See bankruptcy court docket for adversary case no. 11-2597, docket no. 6, Exhibit 4.)

22. Also filed with the motion for summary judgment was Gillespie's 2007 City of Milwaukee Combined Property Tax Bill, showing a total assessed value for the North Palmer Street property of $75,800, and a total estimated fair market value of $82,100. (See bankruptcy court docket for adversary case no. 11-2597, docket no. 6, Exhibit 11.)

23. Gillespie filed a cross-motion for summary judgment on February 21, 2012. (See bankruptcy court docket for adversary case no. 11-2597, docket no. 15.) Gillespie also filed a supporting brief. (Id. at docket no. 16.) The City filed its reply on March 12, 2012. (Id. at docket no. 17.)

24. The parties presented oral argument on April 2, 2012. (Id. at docket no. 21 (audio recording).) At that hearing, counsel for the plaintiffs presented the Court and counsel with copies of Murphy v. Town of Harrison (In re Murphy), 331 B.R. 107 (Bankr. S.D.N.Y. 2005). The City asked for an opportunity to

respond, and the Court allowed the parties to present supplemental briefs.  Id.
The City filed its supplemental brief on April 16, 2012.  (Id. at docket no. 19.)
Rita Gillespie filed her letter brief on April 20, 2012.  (Id. at docket no. 20.)

### FACTS APPLICABLE TO ALL PLAINTIFFS

25.    In its briefs, and at oral argument, the City described in detail the extended process it uses–required by Wis. Stat. §75.521–in reaching a final foreclosure judgment.  (City of Milwaukee's brief in support of its motion for summary judgement, pages 3 through 6, and attached exhibits–Williams docket no. 19; Campbell docket no. 20; Gillespie docket no. 16; audio recording of April 2, 2012 oral argument, Williams docket no. 25, Campbell docket no. 27, Gillespie docket no. 21.)

26.    The City utilizes a "pre-foreclosure" process--six notices to the homeowner warning of the delinquency and the consequences of failure to cure, then referral of the homeowner to an outside collection counsel, then preparation of the foreclosure documents and filing of the foreclosure petition. The homeowner may redeem at any time up to a specified "final redemption date"–a date at least eight weeks from the date of first publication of the notice and petition for foreclosure.  (Notice is by publication.)  By this point, the property will have been delinquent for some two years.  If the homeowner doesn't find out about the foreclosure proceedings, or appear to contest the foreclosure proceedings, the City obtains a judgment of foreclosure.  (If the homeowner objects, a judicial officer resolves the objection.)  Within ninety days of the entry of the foreclosure judgment, the homeowner may petition the Milwaukee Common Council to reopen and vacate the foreclosure judgment, and to allow the homeowner to redeem.  The City asserts that it keeps homeowners informed at every step of this process, providing the homeowner with numerous written notices and copies of documents.  The City ceases to send these notices and documents if the homeowner files for bankruptcy relief. Id.

27.    At oral argument, the plaintiffs did not dispute the City's claim that the tax lien foreclosure proceedings that it uses provides due process to homeowners.  (Audio recording of April 2, 2012 oral argument, Williams docket no. 25, Campbell docket no. 27, Gillespie docket no. 21.)

Conclusions of Law

1.    Fed. R. Bankr. P. 7056 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See*

*also*, Celotex Corp. V. Catrett, 447 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1985).

2. Title 11, United States Code, §548(a)(1)(B) states as follows:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . (I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . . .

3. To establish a fraudulent transfer/conveyance under §548(a)(1)(B), the trustee must prove:

> . . . (1) a transfer of the debtor's property or interest therein; (2) made within two years of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) . . . the debtor was insolvent when the transfer was made or he was rendered insolvent thereby . . . .

In re Eckert, 388 B.R. 813, 831 (Bankr. N.D. Ill. 2008) (citations omitted), *affirmed sub nom*, Grochocinski v. Schlossberg, 402 BR 825 (N.D. Ill. 2009).

4. The parties agree that the facts of the cases establish three of the four elements of a §548(a)(1)(B) cause of action–the debtors' properties were transferred to the City; they were transferred within two years prior to the petition dates; and the debtors either were insolvent at the times of the transfers, or were rendered insolvent by the transfers. (City of Milwaukee's brief in support of its motion for summary judgement, page 8–Williams docket no. 19; Campbell docket no. 20; Gillespie docket no. 16.) The parties have asked the Court to decide the question of whether the debtors received less than a reasonably equivalent value for the conveyances. Id.

5. The Bankruptcy Code does not define the term "reasonably equivalent value." Eckert, 388 B.R. at 835. In the Seventh Circuit, a court must determine "the value of what was transferred and compare that value to the value the debtor received." Id., citing Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997).

6. Determining "reasonably equivalent value" is a two-step process–first, the

7

Case 11-02561-gmh    Doc 28    Filed 05/25/12    Page 7 of 20

court must determine whether the debtor received value, and second, the court must determine whether the value the debtor received was reasonably equivalent to the value he gave up. Id.

7. Equivalent value is determined as of the time of the transfer. Id., citing Baldi v. Lynch (In re McCook Metals, LLC), 319 B.R. 570, 589 (N.D. Ill. 2005).

8. Factors which a court must consider in determining whether a debtor received reasonably equivalent value include "(1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." Id., citing Barber v. Golden Seed Co., 129 F.3d at 387; Grigsby v. Carmell (In re Apex Auto. Warehouse, LP), 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999).

9. The trustee bears the burden of proof on whether the debtor received reasonably equivalent value. Id., citing Barber, 129 F.3d at 387.

10. Section 548(d)(2)(A) of the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor."

11. In BFP v. Resolution Trust Corp., 511 U.S. 531 (1994), the United States Supreme Court held in the context of a mortgage foreclosure sale that using fair market value as the "benchmark against which determination of reasonably equivalent value [was] to be measured" was "not consistent with the text of the Bankruptcy Code." BFP v. Resolution Trust Corp., 511 U.S. 531, 536-37 (1994). This was, the Court stated, because, among other things, the concept of fair market value "has no applicability in the forced-sale context." Id. at 537.

12. The BFP Court concluded "that a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." Id. at 545.

13. The BFP Court clarified, however: "We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." Id. at 537 n.3.

14. The City cited numerous cases which, it argued, extended the BFP reasoning to support the conclusion that the amount owed for delinquent taxes constituted "reasonably equivalent value." Most of those cases, however,

8

involved foreclosure processes which had included *sales or auctions*–in other words, they involved processes in which the market had operated, giving the deciding courts a basis for determining "reasonably equivalent value."

15.     In In re Murray, 276 B.R. 869 (Bankr. N.D. Ill. 2002), the county had sold the property to the movant in a foreclosure sale pre-petition. Id. at 871. The Murray case did not involve a §548(a)(1)(B) cause of action; it involved the county's filing of a motion for relief from stay filed after the Chapter 13 debtor failed to redeem during the post-sale redemption period. Id. at 871-72. In opposing the motion for relief from stay, however, the debtor argued that he might have a potential §548 claim for avoiding the tax sale. The Murray court noted that the purchaser had purchased only the delinquent taxes, not the underlying title to the property, and looked to the BFP decision in responding that "a non-collusive and regularly conducted foreclosure sale could not be challenged [under §548] as a fraudulent conveyance." Id. at 878, citing BFP v. Resolution Trust Corp., 511 U.S. at ___, 114 S. Ct. at 1757. So while the City is correct that the Murray court stated, "By analogy, *BFP* logically applies to tax sales," id., the City ignores the fact that the Murray court extended the BFP reasoning to finding that properly-conducted tax ***sales*** did not constitute fraudulent conveyances. It did not make any findings on whether a foreclosure procedure that did not include a sale might constitute a fraudulent conveyance.

16.     Similarly, in Kojima v. Grandote Int'l Ltd. Liability Co. (In re Grandote Country Club Co., Ltd.), 252 F.3d 1146 (10th Cir. 2001), the Tenth Circuit held that a transfer resulting from a tax sale did not constitute a fraudulent transfer. The Grandnote court conceded that "courts have not been unanimous in extending *BFP* to the tax sale context, with [the Tenth Circuit's] Bankruptcy Appellate Panel among those refusing to apply *BFP* to a transfer made by a tax sale." Id. at 1152, citing Sherman v. Rose (In re Sherman), 223 B.R. 555, 558-59 (B.A.P. 10th Cir. 1998). But in the following sentence, the Grandote court stated, "Nevertheless, the decisive factor in determining whether a transfer pursuant to a tax sale constitutes 'reasonably equivalent value' is a state's procedure for tax sales, in particular, statutes requiring that tax sales take place publicly under a competitive bidding process." Id. The Grandote court specifically referenced the Bankruptcy Appellate Court's refusal "to extend *BFP* to a tax sale conducted under Wyoming statutes that 'do not permit a public sale with competitive bidding.'" Id.

17.     In Washington v. County of King William (In re Washington), 232 B.R. 340 (Bankr. E.D. Va. 1999), the court stated that "[t]he principal issue before this court is whether the standards for reasonably equivalent value developed by the Supreme Court in *BFP* should be extended to judicial tax sales." Id. at

9

343. While the Washington court concluded that the tax sale of the debtor's property did not constitute a fraudulent conveyance under §548, like the courts discussed above, it made that determination in a *sale* context.

18.    The other cases the City cited–In re Samaniego, 224 B.R. 154 (Bankr. E.D. Wash. 1998); Russell-Polk v. Bradley (In re Russell-Polk), 200 B.R. 218 (Bankr. E.D. Mo. 1996); Golden v. Mercer County Tax Claim Bureau (In re Golden), 190 B.R. 52 (Bankr. W.D. Pa. 1995); Hollar v. Meyers (In re Hollar), 184 B.R. 243 (Bankr. M.D.N.C. 1995); Lord v. Neumann (In re Lord), 179 B.R. 429 (Bankr. E.D. Pa. 1995); Comis v. Bromka (In re Comis), 181 B.R. 145 (Bankr. N.D.N.Y. 1994); and McGrath v. Simon (In re McGrath), 170 B.R. 78 (Bankr. D.N.J. 1994)–all involved debtors attacking the transfers of their properties via tax *sales*. None involved a non-sale foreclosure proceeding.

19.    In footnote 4 on page 11 of its brief, the City indicates that there are several cases which reached the opposite result, but implicitly dismisses these holdings because, in those cases, "the particular state foreclosure proceedings involved . . . were deficient in some respect and/or failed to provide requisite due process or other protections to debtors." (See City's brief in support of motion for summary judgment, page 11 n.4, Williams, 11-2527, docket no. 9; Campbell, 11-2561, docket no. 9; Gillespie, 11-2597, docket no. 6.)  Because the plaintiffs did not dispute that the State of Wisconsin's strict foreclosure procedure under Wis. Stat. §75.521 complied with due process requirements, the City seems to argue, these cases do not apply.

20.    One of the cases the City cites is Sherman v. Rose (In re Sherman), 223 B.R. 555 (B.A.P. 10th Cir. 1998), the case in which the Tenth Circuit found that the transfer was fraudulent because "the Wyoming tax sale statutes do not permit a public sale with competitive bidding." Id. at 559.  The court stated that

> there is a significant difference between the circumstances of this case and those surrounding the previously cited bankruptcy court decisions that have upheld the applicability of the *BFP* rule to tax sales.  Even if *BFP* were held to be applicable to tax sales, here the transfer of the real property to the appellee would still be avoidable, for the Wyoming tax sale statutes do not have the protections as do the Wyoming foreclosure sale statutes, as discussed in *Russell-Polk, Golden, Hollar, Lord*, and *McGrath*, cited above.

Id. at 559.  That case seems to support the *plaintiffs'* position, not the City's.

10

21. In <u>Chorches v. Fleet Mortgage Corp., et al., (In re Fitzgerald)</u>, 255 B.R. 807 (Bankr. D. Conn. 2000), the Connecticut court considered a tax sale statute that provided for a "strict foreclosure" proceeding–one that did not involve a sale. The court concluded,

> Guided by the foregoing analysis of the evidentiary value of a strict foreclosure under Connecticut law, this court stands by its original conclusion in *Fitzgerald I* that a Connecticut strict foreclosure has an insufficient evidentiary value to trigger the *BFP* conclusive presumption of 'reasonably equivalent value' under Bankruptcy Code §548(a)(1)(B).

<u>Id.</u> at 814.

22. The *only* case the City cites in which a court found that a transfer of property by means of a tax foreclosure proceeding that did not involve a sale was not a fraudulent transfer was <u>Talbot v. Federal Home Loan Mtg. Corp. (In re Talbot)</u>, 354 B.R. 63 (Bankr. D. Conn. 2000). The <u>Talbot</u> court opined that <u>BFP</u> "was not predicated on a theory that a competitive bidding process provides the most accurate indication of the market forces that define a property's value." <u>Id.</u> at 69. Rather, the court reasoned, "the Court held that the states, not the market, were entitled to define the 'value' of the property in the mortgage foreclosure context." <u>Id.</u> In reaching this conclusion, the <u>Talbot</u> court did not rely on any other cases.

23. The <u>Fitzgerald</u> court disagreed with the <u>Talbot</u> analysis. (See <u>Chorches v. Fleet Mortgage Corp., et al., (In re Fitgerald)</u>, 255 B.R. 807, 814 (Bankr. D. Conn. 2000). After going over, in painstaking detail, the ways in which Connecticut's strict foreclosure statute failed to provide any evidentiary basis for a finding of "reasonably equivalent value," the <u>Fitzgerald</u> court stated, "For the foregoing reason, the court respectfully disagrees with *Talbot v. Federal Home Loan Mortgage Corp. (In re Talbot)*, 254 B.R. 63 (Bankr. D. Conn. 2000)."

24. This Court, too, respectfully disagrees with the <u>Talbot</u> analysis. While the Bankruptcy Code does not define the concept of "reasonably equivalent value," one can infer from those three words that a determination of "reasonably equivalent value" requires a court to try to figure out what the "value" of the property being transferred might be. Value, of course, is a relative concept–what is worth a king's ransom to one person is valueless to another. What is highly valued in one circumstance has little value in another. One need only look to the currency markets to know that the "value" of a particular currency depends on the health of its home country's economy, the health of the global economy, the political environment, and numerous other

11

facts. So, too, the value of a piece of property depends on many factors.

25. This Court reads the Supreme Court's decision in <u>BFP</u> to articulate this relative concept of value. The <u>BFP</u> decision points out that "value" must be different in the context of a "forced" sale–a mortgage foreclosure sale, or a tax foreclosure sale–than in the context of a "voluntary" sale–one with willing buyers and a willing seller. This seems an obvious point–a voluntary seller is often in a position to hold out for a higher sale price, thus causing willing buyers to competitively bid. That competition is reduced in cases where the buyer, while willing, has a strong incentive to move the property quickly, and the buyers, while willing, are aware that the seller's motivation favors speed over obtaining the highest sale price. The decision acknowledges that, while a property might be worth $100,000 in a "voluntary" sale, a property being sold at a mortgage foreclosure auction isn't involved in a "voluntary" sale, and thus the "value" assigned it by the market in which it is being sold will necessarily be less.

26. This Court does not read <u>BFP</u> to hold that *any* value which a forced seller chooses to assign a property constitutes "reasonably equivalent value" for the purposes of §548(a)(1)(B). For example, if a mortgage lender chose to auction a foreclosed 3-bedroom house in good condition with an assessed value of $110,000, and chose a starting bid price of $2.00, and the competitive bidding resulted in a final sale price of $250, it would fly in the face of reason to conclude that the "reasonable equivalent value" of that three-bedroom house was $250. Certainly, as the <u>BFP</u> court held, the "reasonably equivalent value" of that house wouldn't necessarily be the $110,000 assessed value, or even the value that the homeowner could have obtained if she'd sold the house in a voluntary sale. But what the Supreme Court said, in this Court's opinion, is that "reasonably equivalent value" is not the same thing as "best possible value to be obtained through a voluntary sale." That does not equate to a conclusion that "reasonably equivalent value" is whatever the foreclosing entity says it is.

27. At the April 2, 2012 oral argument on the summary judgment motions, the plaintiffs brought to the Court's and the City's attention <u>Murphy v. Town of Harrison (In re Murphy)</u>, 331 B.R. 107 (Bankr. N.D.N.Y. 2005). The <u>Murphy</u> court held that a transfer pursuant to New York's strict tax foreclosure process constituted a fraudulent transfer. <u>Id.</u> at 120-121. In its supplemental brief, the City argues that <u>Murphy</u> was wrongly decided; this Court disagrees.

28. In reaching its conclusion, the <u>Murphy</u> court stated what this Court has tried to articulate above:

> Certainly, New York State has a strong interest in assuring

12

> that its citizens meet their tax obligations and to enforce those obligations when they remain unmet. However, that interest cannot overcome Congress' policy choice that reasonably equivalent value must be obtained for a transfer of a debtor's property in the bankruptcy context, where the rights of other creditors are prejudiced. Unlike a mortgage foreclosure and sale, such as in *BFP*, there is not the essential state interest of assuring security in title following a public sale. Here, a taxing authority seeks to enforce its liens not by public sale but instead by seizing title to the Property. Although the Supreme Court in *BFP* recognized that the value obtained in a foreclosure sale may be significantly less than would be obtained if the property were sold under normal circumstances (willing seller, willing buyer), the holding in *BFP* does not support the conclusion that a forfeiture of property is, as a matter of law, for reasonably equivalent value under Section 548 when there are no market forces at work at all.

Id. at 120.

29. In this Court's view, therefore, the case law overwhelmingly supports the plaintiffs' counter-motions for summary judgment, and defeats the City's motions. Only one of the numerous cases the City cited found that a transfer pursuant to a "strict" (non-sale) foreclosure statute did not constitute a fraudulent transfer, and that one decision was squarely rejected, in a well-reasoned opinion, by a sister court. In contrast, the remaining cases find no fraudulent transfers where the transfers involved a sale procedure, but find fraudulent transfers in cases where no sale was involved. The Court finds the reasoning of the majority of cases to be highly persuasive.

30. The City also raises several policy arguments in support of its position. It argues, for example, that the Bankruptcy Code treats tax debt differently than it treats other types of debts, and asserts that this fact constitutes circumstantial evidence that tax foreclosure transfers should be treated differently than other transfers in the fraudulent conveyance context. The Court agrees that the Code treats tax debt differently–Section 507(a)(8), for example, accords priority status to certain tax claims. Section 511 provides that in the bankruptcy context, taxing authorities may collect interest on their claims at a special rate not available to other creditors. The Court does not agree, however, that these provisions lead to the conclusion that Congress intended to somehow exempt taxing authorities from the "reasonably equivalent value" element of a §548 fraudulent conveyance claim, or to apply a different definition of "reasonably equivalent value" for taxing authorities.

13

31. As the Murphy court succinctly stated, "The Bankruptcy Code affords taxing authorities no exception, and a taxing authority is bound by the Bankruptcy Code to the same extent as any other creditor." In re Murphy, 331 B.R. at 120-121, citing United States v. Whiting Pools, Inc., 462 U.S. 190, 209 (1982). While the City dismisses this finding as the Murphy court "brushing off" the Bankruptcy Code's special treatment of taxing authorities, the Murphy court's next sentence belies that argument. The court went on to state, "As the Supreme Court held [in Whiting Pools], 'Congress carefully considered the effect of the new Bankruptcy Code on tax collection . . . and decided to provide protection to tax collectors, such as the IRS, through grants of enhanced priorities for unsecured tax claims . . . and by the nondischarge of tax liabilities.'" Id. at 121.

32. In other words, Congress could have made clear that it wanted to exempt taxing authorities from the "reasonably equivalent value" analysis, or subject them to a different analysis. It did not do so.

33. The City argues that if this Court were to conclude that "strict" foreclosures that take place within two years of the petition date constitute fraudulent conveyances, it would be ignoring the BFP court's statement that equating fair market value to "reasonably equivalent value" would negatively effect the "essential state interest" in the security of mortgage titles, putting all property purchased at a foreclosure sale "under a federally created black cloud." BFP v. Resolution Trust Corp., 511 U.S. at ___, 114 S. Ct. at 116-117.

34. This argument ignores the fact that the BFP court was dealing with a context in which there had been some market forces at play–the forces at play in a mortgage foreclosure sale–which provided evidence of how a particular market would value that property. Further, it ignores the fact that a finding that a "strict foreclosure" constitutes a fraudulent transfer would not deprive the state of its interest in collecting its tax debts. As the Murphy court stated, "There is no dispute that the [taxing authority] has the right to enforce its lien and to collect on the debtor's tax obligation, and it would be able to do so in the context of debtor's bankruptcy case. [The taxing authority] is not denied its very important interest in securing payment of outstanding tax obligations by reason of avoidance of the transfer to the extent necessary to protect other creditors." In re Murphy, 331 B.R. at 121.

35. The Murphy court's reference to the Bankruptcy Code's requirement that courts must consider the impact of a pre-petition transfer on all creditors leads to a discussion of another of the City's arguments. The City points to the Murphy court's statement that "[c]ourts have consistently held that an avoidance action can only be pursued if there is some benefit to creditors and

14

may not be pursued if it would only benefit the debtor." Id. at 122, citing, *e.g.*, Wellman v. Wellman, 933 F.2d 315, 218 (4th Cir.), *cert. denied*, 502 U.S. 925 (1991).  The City speculates in footnote 2 of its post-argument brief that the Murphy decision likely was based on the fact that "the 'fraudulent transfer' avoidance ordered in that case was carefully limited to the amount necessary to satisfy creditors' claims against the bankruptcy estate and that the remaining surplus funds were sufficiently large to satisfy the debtor's tax arrearages to the taxing jurisdiction . . . ."

36.     It is true that the Murphy court made reference to the fact that "[t]here is no dispute that the recovery of any avoidance would benefit the estate in this case." Id.  The City assumes, however, that (a) the Murphy court would have reached a different conclusion had the parties disputed the benefits of any recovery to the estate, and (b) that there would be no benefits to the estate in the cases at bar if the Court were to order those conveyances avoided.  There is nothing before the Court to support either one of those assumptions.

37.     The Court has no way of knowing what the Murphy court would have done had the parties disputed the value the avoidance would bring to the estate.  Perhaps, if the parties had agreed that the avoidance action would've produced no benefit for the estate, the court would have dismissed the case under Fed. R. Bankr. P. 7012.  That, however, is speculation–this Court cannot know what might have happened under other circumstances.

38.     Nor is there any evidence that the estates in these cases would not benefit from the avoidance actions.  The City argues that because the debtors/plaintiffs, rather than the Chapter 13 standing trustees, are bringing these avoidance actions, it must be the case that the trustees have concluded that the actions would recover no benefits for the estates.  This assumption is, in the Court's view, faulty.  This is not the first time that the Court has seen a trustee defer to a debtor in pursuing an avoidance action.  In this district, there are two standing Chapter 13 trustees.  The two trustees' offices employ, combined, six lawyers.  Those six lawyers must administer all of the Chapter 13 cases filed in the Eastern District of Wisconsin.  In contrast, there are dozens of Chapter 13 debtors' attorneys who practice in the Eastern District.  If the trustee has a debtor's attorney who is willing to spend the time and effort to litigate an action, it is not surprising that the trustee would defer to that attorney to conserve time and resources.

39.     Further, the City's argument ignores the fact that two of the three transfers involved *rental* properties–*income-producing* properties.  Both plaintiff Williams' property and plaintiff Gillespie's property were rentals.  If the transfers of those properties are avoided, there is an opportunity for revenue

15

for the estates.

40.  Of all of the City's policy arguments, however, the one it emphasized most at every juncture–its original briefs, its reply briefs, oral argument, and its post-argument briefs–was a pragmatic argument.  The City states in its post-argument brief that,

> Were this Court to rule in Debtors' favor, thus permitting property owners who have failed to pay their property taxes, often for many years, to regain their properties more than two years after those taxes have become overdue and delinquent simply by alleging post-judgment 'fraudulent transfer' under 11 U.S.C. §548, the City would be deprived of its ability to effectively utilize Wis. Stat. §75.521.  This would overturn a *status quo* that has operated successfully since 1948 for the City and for a comparable period in much of the State of Wisconsin.

(See City's post-argument letter brief at page 8, Williams, 11-2527, docket no. 22; Campbell, 11-2561, docket no. 24; Gillespie, 11-2597, docket no. 19.)

41.  The City argues that if the Court finds in the debtors' favor, it will have no choice but to either use the "tax deed" process provided in Wis. Stat. §§75.12-25.14, "a summary administrative process in the nature of a strict foreclosure . . . [which] includes no judicial supervision or involvement and affords far less due process to a debtor than is afforded by Wis. Stat. § 75.521 (which makes it vulnerable to attack on constitutional due process grounds)," or to use the Wisconsin mortgage foreclosure process (Wis. Stat. Chapter 846). The City argues that the mortgage foreclosure process is too unwieldy, because currently taxing authorities are able to commence and prosecute tax lien foreclosures in larger urban areas "on a mass basis against large numbers of tax-delinquent parcels of real estate," where as mortgage foreclosure proceedings "must be commenced and prosecuted against properties eligible for mortgage foreclosure on an individual basis."  Such individual prosecutions, the City argues, would be "prohibitively expensive."

42.  The City asserts,

> It was precisely these considerations that led Wisconsin in 1947 to adopt Wis. Stat. §75.521, an efficient and effective method of *in rem* tax foreclosure that was intended to: (a) encourage the full and timely payment of real estate taxes and thereby discourage tax delinquency; (b) afford ample due process to tax debtors and be invulnerable from due process and other forms of constitutional

16

attack; and (c) be suitable for use in larger urban and suburban areas where the volume of tax foreclosures impel the employment of mass proceedings against large groups of tax-delinquent parcels as opposed to individual case proceedings against specific parcels.

The City concludes by stating that "[t]his Court should defer to the sound judgment of the Wisconsin Legislature in enacting Wis. Stat. 75.521, which has admirably promoted the stability of local government finances throughout the State of Wisconsin by affording an efficient mechanism for *in rem* foreclosure of tax liens while protecting the due process rights of tax-delinquent property owners." Id. at 8-9.

43.    This Court takes very seriously the suggestion that its ruling could dismantle an entire state's property tax collection procedure. It also takes very seriously the suggestion that its ruling could be read as a gesture of disrespect toward the legislative branch of Wisconsin's government. But while it takes those suggestions very seriously, the Court disagrees that its ruling would work either of those results.

44.    The Murphy court was faced with a similar argument–that its ruling would dismantle the State of New York's property tax collection procedure. The Murphy court replied to that argument as follows: "Although the result here impinges on a state regulatory scheme, it does so only to the extent that the scheme conflicts with the clear dictates of the Bankruptcy Code. The state's interest in enforcing its unpaid tax obligations is recognized by the Bankruptcy Code and, in fact, given higher priority than other creditors' interests." In re Murphy, 331 B.R. at 122.

45.    This reasoning applies equally in the current cases. By ruling that a "strict foreclosure" pursuant to Wis. Stat. §75.521 constitutes a fraudulent transfer, the Court is not invalidating Wis. Stat. §75.521. It is holding that, in the context of a bankruptcy proceeding, such a transfer is subject to a §548 "reasonably equivalent value" analysis. Taxing authorities in Wisconsin, including the City, have available several tools which could allow them to continue to use the §75.521 "strict foreclosure" procedure, while defending against a homeowner/debtor's §548 claim in the event that the homeowner files for bankruptcy.

46.    First, taxing authorities could do what the plaintiffs claim the City had been doing up until about a year or so ago. The plaintiffs argue that in the past, when a homeowner with a tax foreclosure judgment against him filed for bankruptcy, the City would, of its own volition, return title to the debtor and allow the debtor to try to redeem the property through the Chapter 13 process.

17

(This is what the defendants here propose to try to do.) When asked why the City had discontinued this (apparently informal) procedure, the attorneys for the City responded, "Whether such a past practice existed has no bearing upon whether the City is legally compelled to adhere to it." (See City's post-argument brief at page 2, Williams, 11-2527, docket no. 22; Campbell, 11-2561, docket no. 24; Gillespie, 11-2597, docket no. 19.)

47. The Court agrees that neither the City nor any other taxing authority is, as far as the Court knows, "legally compelled" to return title to a Chapter 13 debtor and allow the debtor to redeem in a potential fraudulent transfer context. The Court notes only that this might be one alternative that would allow taxing authorities to continue to use the "strict foreclosure process," while avoiding fraudulent transfer litigation in the bankruptcy context.

48. Second, holding that, in these three cases, the transfers violated §548(a)(1)(B) does not mean that *every* tax-lien foreclosure transfer, even if conducted via the "strict foreclosure" process, will constitute a fraudulent conveyance. Transfers that do not occur within the two-year period prior to the bankruptcy petition date are not fraudulent transfers. True, the taxing authority has no idea, when it makes the transfer, whether the homeowner eventually will file for bankruptcy relief, or when. It must assume that some homeowners may so file. But it is highly unlikely that everyone whose home is foreclosed due to tax liens will stampede the bankruptcy court just to avoid the transfer–bankruptcy is a long, intrusive and expensive process, and the consequences for abusing the system when one is not eligible for relief are serious ones.

49. Similarly, if the homeowner was not insolvent at the time of the transfer, or was not rendered insolvent by the transfer, there is no fraudulent transfer.

50. As this decision discusses, transfers made for "reasonably equivalent value" are not fraudulent transfers. Depending on the amount the homeowner owed in delinquent taxes, and the value–whether assessed, fair market, or forced-sale–of the property, some transfers that result from tax lien foreclosures may very well be for "reasonably equivalent value."

51. In short, taxing authorities are free to litigate every element of a fraudulent transfer claim when a debtor chooses to bring one. This is another option available to taxing authorities, whereby they can continue to use the "strict foreclosure" procedure but defend against fraudulent transfer claims.

52. The City argues that, instead of using the above tools (or others that probably exist), a ruling against it in these cases will force taxing authorities to

resort to either of two other procedures provided by Wisconsin law–the "tax deed" procedure or the mortgage foreclosure procedure.

53. The City argues that the "tax deed" procedure involves few due process safeguards (no judicial oversight, for example), and is vulnerable to constitutional attack. This Court is not familiar with the tax deed procedure, and in any event has no occasion to review or consider its constitutionality. The Court notes, however, that if it finds that the Wis. Stat. §75.521 "strict foreclosure" procedure does not suffice for determining "reasonably equivalent value," and if the "tax deed" procedure, like "strict foreclosure," involves no competitive bidding procedure, then using that procedure will not assist taxing authorities in defending fraudulent transfer claims in bankruptcy court.

54. The City argues that the mortgage foreclosure procedure is too cumbersome and expensive to be effective, particularly in large urban/suburban areas which involve mass quantities of tax foreclosures. The Court does not know whether the mortgage foreclosure procedures are unworkable in a tax lien foreclosure context. If they are, however, that is not, in itself, a basis for ignoring the fact that under the overwhelming majority of case law, a transfer pursuant to a "strict foreclosure" proceeding that does not involve competitive bidding does not suffice for a determination of "reasonably equivalent value" pursuant to §548(a)(1)(B).

Conclusion

55. The parties argued, and the Court agrees, that these adversary cases raise no genuine issue of material fact. The sole question for the Court to decide is the legal question of whether a "strict foreclosure" tax lien foreclosure proceeding that does not involve any competitively-bid sale procedure suffices to establish "reasonably equivalent value" for the purposes of §548(a)(1)(B). Thus, the Court agrees that these cases are appropriate for resolution by summary judgment.

55. The case law overwhelmingly supports the conclusion that a tax foreclosure procedure which does not include some competitive sale process is not sufficient to establish "reasonably equivalent value" for purposes of 11 U.S.C. §548(a)(1)(B).

56. The policy arguments posited by the City do not persuade the Court to the contrary.

57. Reduced to its basic premise, the City's argument asks the Court to conclude that each of the properties transferred in these cases had a value

19

"reasonably equivalent" to the amount the particular property's owner owed in delinquent taxes.

58. The Court cannot conclude, either for the legal reasons outlined above or for common sense reasons, that:

* Kevin Williams' property, with a value as assessed by the City near the time of transfer of $190,400 and a total estimated fair market value of $206,300, had a "reasonably equivalent value" of $14,518–less than 8% of the City's assessed value;

* The Campbells' property, with a value as assessed by the City near the time of transfer of $109,500 and a total estimated fair market value of $115,900, had a "reasonably equivalent value" of $8,121.35–less than 8% of the City's assessed value; or

* Rita Gillespie's property, with a value as assessed by the City near the time of transfer of $75,800 and a total estimated fair market value of $82,100, had a "reasonably equivalent value" of $12,070.77–less than 16% of the City's assessed value.

**WHEREFORE**, the Court hereby **DENIES** defendant City of Milwaukee's motions for summary judgment in the three above-captioned cases. The Court further **GRANTS** the motions for summary judgment filed by plaintiffs Kevin C. Williams, Judson W. and Therese M. Campbell, and Rita Gillespie, and **ORDERS** that the transfers of the parcels of real property described in the complaints are avoided, and that the defendant must return title to those properties to the above-named plaintiffs, and allow them to attempt to redeem the properties via their Chapter 13 plans.

An order of judgment will follow.

# # # # #

20

Case 11-02561-gmh    Doc 28    Filed 05/25/12    Page 20 of 20

"reasonably equivalent" to the amount the particular property's owner owed in delinquent taxes.

58. The Court cannot conclude, either for the legal reasons outlined above or for common sense reasons, that:

* Kevin Williams' property, with a value as assessed by the City near the time of transfer of $190,400 and a total estimated fair market value of $206,300, had a "reasonably equivalent value" of $14,518–less than 8% of the City's assessed value;

* The Campbells' property, with a value as assessed by the City near the time of transfer of $109,500 and a total estimated fair market value of $115,900, had a "reasonably equivalent value" of $8,121.35–less than 8% of the City's assessed value; or

* Rita Gillespie's property, with a value as assessed by the City near the time of transfer of $75,800 and a total estimated fair market value of $82,100, had a "reasonably equivalent value" of $12,070.77–less than 16% of the City's assessed value.

**WHEREFORE**, the Court hereby **DENIES** defendant City of Milwaukee's motions for summary judgment in the three above-captioned cases. The Court further **GRANTS** the motions for summary judgment filed by plaintiffs Kevin C. Williams, Judson W. and Therese M. Campbell, and Rita Gillespie, and **ORDERS** that the transfers of the parcels of real property described in the complaints are avoided, and that the defendant must return title to those properties to the above-named plaintiffs, and allow them to attempt to redeem the properties via their Chapter 13 plans.

An order of judgment will follow.

# # # # #